UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION


| | |
|---|---|
| Carlette Marie Duffy, | ) |
| | ) |
| Plaintiff, | ) |
| | )    1:09-cv-0611-SEB-DML |
| vs. | ) |
| | ) |
| Indiana Juvenile Justice Task Force, | ) |
| Executive Director William Glick, Program | ) |
| Director Joann Helferich, | ) |
| | |
| Defendant. | |


**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**


This cause is before the Court on a Motion for Summary Judgment [Docket No.

57] filed by Defendants Indiana Juvenile Justice Task Force ("IJJTF"), IJJTF Executive

Director William Glick, and IJJTF Program Director Joann Helferich (hereafter,

"Defendants") against Plaintiff Carlette Marie Duffy, the former IJJTF Community

Resource Coordinator.  Plaintiff opposes Defendants' motion.  For the reasons detailed

herein, Defendants' motion is <u>GRANTED</u>.

**Factual Background[1]**

---

[1]While we accept the supported facts offered in Plaintiff's responsive briefing as true,
these facts are few and in any event fail to address the vast majority of the facts recited by
Defendants.  Indeed, as Defendants point out in their reply brief, Plaintiff's response contains
only seven "disputed facts for consideration" and eleven "material facts not in dispute" as
compared to the 23 paragraphs of facts included in Defendants' opening brief.  Plaintiff's vague
statement that she "disputes and denies all facts" in Defendants' brief is wholly deficient under
(continued...)

Aftercare for Indiana through Mentoring ("AIM") is a program that provides mentoring, education, career support and other services to incarcerated youths to ease the transition back into the community. Glick Aff. ¶ 4. At the time Plaintiff began her employment at AIM in 2003, the program was operated by Indiana University-Purdue University at Indianapolis ("IUPUI"). Duffy Aff. ¶¶ 4-5. Plaintiff was the only African-American coordinator in the AIM program throughout the course of her employment. Duffy Aff. ¶ 16; Conrad Aff. ¶ 16. Sometime in the Spring of 2007, as the AIM program began to grow beyond the resources available to it at IUPUI, IJJTF received a grant from the Lilly Endowment to begin operating the program.[2] Duffy Dep. at 47-48; Glick Aff. ¶ 7.

Brenda Adams-Turk (hired by IJJTF in June 2007 as Fiscal and Training Coordinator), Theresa Brady (hired by IJJTF to continue the Coordinator position she held when AIM was operated by IUPUI), and Plaintiff (hired by IJJTF in August 2007 as AIM Community Resource Coordinator) were among those staff members that IJJTF

---

[1](...continued)
either Federal Rule of Civil Procedure 56 or Southern District of Indiana Local Rule 56.1. To avoid summary judgment, a plaintiff must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). "A court is not required to 'scour the record in search of evidence to defeat a motion for summary judgment.'" Ritchie v. Glidden Co., 242 F.3d 713, 723 (7th Cir. 2001) (quoting Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 562 (7th Cir. 1996)). Thus, the Court shall consider the unaddressed facts as undisputed for purposes of this motion, as provided for by Fed. R. Civ. P. 56(e)(2).

[2]IJJTF monitors jails and other detention-type facilities, provides training and technical assistance to Indiana counties, and educates the public on issues affecting juveniles to ensure compliance with the Juvenile Justice and Delinquency Prevention Act of 1974. Glick Aff. ¶ 3.

absorbed from the IUPUI AIM program during the transition.  Joann Helferich (hired by

IJJTF in July 2007 as interim Program Director) from the office of the Marion County

Public Defender and Melissa Conrad (hired by IJJTF in Summer, 2007 as the AIM

Operations Coordinator) from the office of Marion County Adult and Child Services also

joined the AIM program when it transitioned into IJJTF management.

As part of the transition of the AIM program, IJJTF Executive Director William

Glick met with AIM staff to inform them that the transfer would not negatively affect the

terms of their employment and, according to Plaintiff, that each staff member would at

some later time receive an increased salary at an amount to be determined at a later time.

Duffy Dep. at 50; 52-53; see also Hurst Aff. ¶ 4.  Glick also discussed the organizational

structure of the AIM program and stated that Conrad, Adams-Turk, and Plaintiff were

expected to occupy the same "level" on the organizational chart.[3]  Duffy Aff. ¶ 18;

Conrad Aff. ¶ 7; Hurst Aff. ¶ 5.  All three of these individuals were scheduled to report to

Dr. Roger Jarjoura.  Id.  None of the coordinators would supervise any of the others.

Duffy Aff. ¶ 15; Conrad Aff. ¶¶ 11-12; Hurst Aff. ¶ 6.

As Community Resource Coordinator, Plaintiff's primary responsibilities included

maintaining and updating a community resource database, managing AmeriCorps

members, and administering the Youth Employment Services ("YES") program.

---

[3]It is unclear whether an actual organizational chart ever existed or was utilized during
this meeting or if Glick was simply referencing a chart to make his point.  In any event, neither
party has designated any such chart as an exhibit, making this distinction of no import to our
analysis.

Helferich Aff. ¶ 6; Duffy Dep. at 85-86; Second Aff. of William Glick, Att. 1

(Community Resource Coordinator Job Description).[4]  The YES program provided

funding to community organizations, including AIM, allowing them to issue vouchers to

youth for services or items needed to overcome obstacles in education and employment.

Duffy Dep. at 91; 97.  Plaintiff collected information from youths seeking such vouchers,

submitted their voucher requests to Helferich, issued vouchers to students, and

maintained YES program files.  Duffy Dep. at 92-100; Glick Aff. ¶ 23.  According to the

Community Resource Coordinator "Job Description" submitted by Defendants, the

position required a minimum education of an associate's degree and a year of experience

working with youth and knowledge regarding community resources.  Second Glick Aff.,

Attachment 1.

        According to Plaintiff, her duties often overlapped with those of the other

coordinators regardless of the differences in their titles.  Duffy Aff. ¶¶ 11, 13.  Conrad

testified by affidavit that she worked with Plaintiff and shared certain job duties with her.

Conrad Aff. ¶ 9.  For instance, both Conrad and Plaintiff acted as a liaison with the adult

and juvenile courts and the Department of Corrections, assisted with information and

documentation in connection with various grants, assisted with and coordinated activities

_____

        [4]In Plaintiff's Sur-Reply, she asks that we strike Glick's Second Affidavit because it was
filed after the Defendants' opening brief, which she deems "inappropriate."  Sur-Reply at 6.  We
are unaware of any authority supporting Plaintiff's position but, more importantly, Plaintiff had
the opportunity to refute the affidavit by virtue of the Court's Order granting her leave to file a
sur-reply.  Therefore, she cannot now maintain that she was in any way prejudiced by our
allowing the affidavit.  Her request is, therefore, denied.

with the AIM Training Institute, and wrote grants. Duffy Aff. ¶ 14. The Program

Operations Coordinator "Job Description" submitted by Defendants references the fact

that the primary purpose of that position was "management of the programs supporting

the vision and function of AIM, its clients, volunteers, and staff in the Indianapolis

Region." Glick Aff., Attachment 3. The description also provides that a minimum of an

associate degree or bachelor's degree, as well as 2-3 years of supervisory experience,

knowledge of the justice system, and youth services was preferred. Id. At times, Dr.

Jarjoura referred Conrad to Plaintiff because Conrad was new to AIM at the time and

unfamiliar with the program and Jarjoura indicated that Plaintiff knew "everything."

Conrad Aff. ¶ 10.

In November 2007, Helferich noticed that the number of hours that AIM program

staff and the AmeriCorps members worked directly with AIM clients ("contact hours")

had decreased dramatically in the preceding months. Helferich Aff. ¶ 7. Helferich

requested that Conrad and Plaintiff remedy this problem by working more directly with

an Indiana Department of Corrections juvenile facility housing AIM clients. Id.

Helferich also specifically directed Plaintiff to monitor and work directly with four

AmeriCorps members. Id. Neither Plaintiff nor Conrad received an immediate pay

increase, change in title, or any other change in their conditions of employment as a result

of this additional duty. Id. Helferich did, however, initiate a request that Glick approve

an increase in Plaintiff's salary from $31,686.00 to $35,000, as a result. Id. ¶ 8. Glick

approved this request on December 6, 2007; Plaintiff's salary was set to increase effective

January 1, 2008.  Glick Aff. ¶ 29.  No other AIM staff members received a pay increase for 2008 as substantial as Plaintiff.  Glick Aff. ¶ 29; Duffy Dep. at 200.  Rather, the other staff members received only a 3% cost of living increase at that time.  Glick Aff. ¶ 29.

Also, as of November 2007, Plaintiff learned from Helferich that she was the only coordinator in the Indianapolis office still earning an annual salary of $31,686 (the same salary she received prior to the AIM transition), as opposed to the $35,000 salary that the other coordinators were receiving.[5]  Duffy Aff. ¶ 20; Duffy Dep. Ex. 18.

On December 13, 2007, Plaintiff prepared a memorandum which she sent to Executive Director Glick, Program Director Helferich and IJJTF Director of Business Services Victoria Rempel detailing the reasons explaining the basis for her anticipated increase in her salary, and posing the following questions:

> Why did I not receive the appropriate salary at the time of hire from the Indiana Juvenile Justice Task Force?
>
> When will I receive the appropriate increase?
>
> Will this increase be retroactive to August 29, 2007?
>
> If the increase is not retroactive to August 29, 2007, why?

Duffy Dep. Ex. 18.

Helferich responded to Plaintiff's memorandum on December 20, 2007, explaining

---

[5]Theresa Brady, AIM's North Region Coordinator who worked in the South Bend office, also continued to receive the $31,686 salary throughout 2007.  Glick Aff. ¶ 26.  Brady did not receive the pay raise that Plaintiff was granted at the end of 2007.  Id.

that Plaintiff had received the appropriate salary at the time of hire and denying that promises of an increased salary were ever made to her.  Duffy Dep. Ex. 20.  She also explained that although Plaintiff's salary may not appear to have increased, the IJJTF calculated the value of various employment benefits provided to its employees as part their total compensation.  She speculated that because IJJTF paid all of its employees' benefits, Plaintiff's compensation may have, indeed, been higher than it was before AIM and Plaintiff were transferred from IUPUI.  Id.  Helferich further informed Plaintiff that any increases in her salary, which were currently under consideration, would be effective January 1, 2008, which would make any salary increase not retroactive.  Id.

On December 21, 2007, Plaintiff sent an amended grievance regarding her salary to IJJTF's Director of Business Services, Victoria Rempel.  Duffy Dep. Ex. 21.  Rempel told Plaintiff that the reason her salary was not increased at the time of hire was due to a lack of funding.  However, she also informed Plaintiff that she would receive an increase in her salary to $35,000, effective January 1, 2008.  Duffy Dep. Ex. 22.

On December 31, 2007, Plaintiff sent a further grievance to Glick regarding her dissatisfaction with her salary and the responses she had received from Helferich and Rempel.  Duffy Dep. Ex. 23.  Plaintiff questioned why, if Rempel's explanation regarding initial lack of funding was true, "was another employee hired at the same level as my position in June with increased pay."  Id.  Plaintiff also expressed dissatisfaction with the January 1, 2008 salary increase in light of the fact that "others of equal employment status, who already receive the increased pay rate, will then also receive an additional 3%

cost of living increase" at that time.  Id.

On January 4, 2008, Glick responded to Plaintiff that any reference by her to any other employee's salary and total compensation would have to be unauthorized, because such information was confidential.  Glick Aff. Attachment 7.  Further, he instructed Plaintiff that her total compensation exceeded her salary "by many thousands of dollars," in light of the fact that IJJTF paid 100% of its employees' benefits.  Id.  Glick stated that Plaintiff's reference to another employee who performed similar job duties was "factually incorrect" because compensation levels were "whenever possible . . . based on . . . a combination of experience, job responsibilities, an employee's place in the chain-of-command, education, and special skills."  Id.  Finally, he denied Plaintiff's request for an additional cost-of-living salary increase of 3% in light of the "unprecedented" salary increase Plaintiff received effective January 1, 2008.  Id.

In January 2008, the IJJTF learned that the Indianapolis Private Industry Council ("IPIC"), who administered the YES program, planned to conduct an audit of IJJTF's YES program files to ensure compliance with IPIC standards.  Duffy Dep. at 111, 114-115.  Plaintiff assured Helferich that the files would be prepared to the best of her ability by the time the audit was conducted two months later, in March 2008.  Id. at 112.  However, despite these assurances, Helferich testified that Plaintiff was "still hurriedly assembling the files in the moments before the auditor arrived."  Helferich Aff. ¶ 11.  The audit results "identified findings for each of the 6 files reviewed, plus two observations."  Helferich Aff., Attachment 2.  The results instructed AIM that it must provide IPIC with a

response identifying the corrective actions and procedures that IJJTF would implement in response to the findings.  Id.  Helferich and Glick were, therefore, disappointed with the results of the audit, particularly in light of positive audit results in the past relating to other programs administered by IJJTF.  Helferich Aff. ¶ 11.

In early April following receipt of the audit results, Helferich directed Plaintiff to focus her efforts on bringing the YES files into compliance with IPIC's standards and updating the community resource database.  Duffy Dep. Ex. 11-12.  Plaintiff responded that she would be unable to perform these tasks by the deadline imposed by Helferich.  Duffy Dep. Ex. 12.  Based on this exchange, Helferich determined that Plaintiff would no longer have responsibility for monitoring AmeriCorps members.  Helferich Aff. ¶ 13.  Helferich testified that her decision to direct Plaintiff to focus on the YES files and community resource database was based in part on her observation of and complaints from coworkers regarding Plaintiff's habit of distracting herself and others from their work with personal conversation.  Helferich Aff. ¶ 13. Still, despite Helferich's instruction, she testified that her review of the YES files in May and June 2008 revealed that Plaintiff was not maintaining adequate documentation.  Id. ¶ 15.

Also in Spring 2008, Helferich directed Plaintiff and AIM Volunteer Coordinator Amanda Aird to complete time studies of their work in hopes of understanding the number of hours spent by AIM staff on various grant-funded activities.  Helferich Aff. ¶ 16.  Specifically, Plaintiff and Ms. Aird were to record their work in fifteen minute increments for several weeks, and both individuals completed these time studies.

Helferich Aff., Attachments 3-4.

In April 2008, Helferich met with Plaintiff and Ms. Aird. Helferich Aff. ¶ 17. Plaintiff brought what appeared to be a voice-activated recorder to the meeting but Helferich instructed her not to record their discussion. Helferich Aff. ¶ 17. On numerous occasions between April and October 2008, according to Helferich, Plaintiff was seen "hiding something under her shirt or opening her desk drawer during conversations." Id. at ¶ 18. When Helferich asked Plaintiff whether was she recording conversations with IJJTF staff and reminded her that such recording was prohibited, Plaintiff denied that she had ever done so. Id.

Upon arriving at the AIM office on the morning of October 24, 2008, Helferich discovered the door unlocked, the alarm unarmed, and electronic equipment on the floor, which caused her to conclude that a break-in had occurred. Id. ¶ 19. After contacting security staff, Helferich testified that she visually inspected all of the AIM offices, and when she entered Plaintiff's office, she "found a plainly visible small voice activated mini-cassette recorder." Id. ¶¶ 20-21. Because of her prior concerns regarding the possibility of Plaintiff's practice of recording conversations at work, Helferich played a portion of the tape in the recorder only to discover own voice had been recorded. Id. Helferich then brought the recorder to the attention of Glick, who with Helferich reviewed the tapes and discovered numerous workplace conversations preserved there. Id.

On October 27, 2008, Glick met with Helferich, Rempel and Plaintiff, during

which meeting Plaintiff acknowledged that she had recorded conversations among the IJJTF staff, despite Helferich's instruction not to do so. Id. ¶ 22. Glick therefore suspended Plaintiff with pay pending further investigation. Glick Aff. ¶ 37.

Glick concluded that Plaintiff's tape recordings warranted her termination of employment by IJJTF. Glick Aff. ¶ 37. According to Glick, he considered Plaintiff's failure to properly maintain the YES files as an additional factor warranting the termination decision. Id. Plaintiff received a termination letter from IJJTF on October 30, 2008. Duffy Dep. at 174.

## Legal Analysis

### I. Standard of Review

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. See id. at 255. However, neither the "mere existence of some alleged factual dispute between the parties," id., 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586

11

(1986), will defeat a motion for summary judgment. <u>Michas v. Health Cost Controls of Ill., Inc.</u>, 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex</u>, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. <u>Id.</u> at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. <u>Waldridge v. Am. Hoechst Corp.</u>, 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. <u>See Shields Enterprises, Inc. v. First Chicago Corp.</u>, 975 F.2d 1290, 1294 (7th Cir. 1992); <u>Wolf v. City of Fitchburg</u>, 870 F.2d 1327, 1330 (7th Cir. 1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. <u>See Celotex</u>, 477 U.S. at 322; <u>Ziliak v. AstraZeneca LP</u>, 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one essential element "necessarily renders all other facts immaterial." <u>Celotex</u>, 477 U.S. at 323.

The summary judgment standard is applied rigorously in employment

discrimination cases, because intent and credibility are such critical issues and direct evidence is rarely available.  Seener v. Northcentral Technical Coll., 113 F.3d 750, 757 (7th Cir. 1997); Wohl v. Spectrum Mfg., Inc., 94 F.3d 353, 354 (7th Cir. 1996).  To that end, we carefully review affidavits and depositions for circumstantial evidence which, if believed, would demonstrate discrimination.  However, the Seventh Circuit has made clear that employment discrimination cases are not governed by a separate set of rules, and thus remain amenable to disposition by summary judgment so long as there is no genuine dispute as to the material facts. Giannopoulos v. Brach & Brock Confections, Inc., 109 F.3d 406, 410 (7th Cir.1997).

## II.    Discussion

Defendants have asserted that they are entitled to a grant of summary judgment with regard to Plaintiff's claims for both race discrimination and retaliation.  We discuss these claims in turn below.

### A.    Plaintiff's Race Discrimination Claim

Under Title VII, it is unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  A plaintiff may prove discrimination under Title VII with either direct evidence of discrimination or indirectly through the burden-shifting analysis established in McDonnell Douglas v. Green, 411 U.S. 792 (1973).  Scaife v. Cook County, 446 F.3d

735, 739 (7th Cir. 2006). Plaintiff has presented no evidence nor has she developed any argument relating to the direct method of proving discrimination and, thus, we shall proceed with our analysis under the indirect method as discussed in McDonnell Douglas.

Under the McDonnell Douglas framework, a plaintiff must begin by establishing a *prima facie* case of discrimination. If one can be established, the burden shifts to the defendant to articulate a nondiscriminatory reason for the actions it took against the plaintiff. If the defendant can offer a legitimate, nondiscriminatory reason for the employment decision, the burden reverts to the plaintiff to show that there is a genuine dispute of material fact that the proffered reason for the employment action is pretextual. Nese v. Julian Nordic Constr. Co., 405 F.3d 638, 641 (7th Cir. 2005). The traditional *prima facie* case requires a showing by the plaintiff: (1) that she was part of a class of persons protected by Title VII; (2) that she was meeting his employer's legitimate job expectations; (3) that she suffered an adverse employment action; and (4) that similarly-situated individuals outside his protected class were treated more favorably. See Elkhatib v. Dunkin Donuts, Inc., 493 F.3d 827, 830 (7th Cir. 2007). Defendants here challenge Plaintiff's ability to establish the fourth element of her prima facie case because she has not been shown to have been similarly situated to the two former coworkers she has identified as comparable, namely, Fiscal and Training Coordinator Brenda Adams-Turk and Operations Coordinator Melissa Conrad.[6] Defendants further assert that, even if

_____

[6] Defendants also contend that Plaintiff was treated identically to (or better than) another
(continued...)

Plaintiff had succeeded in establishing her prima facie case, she has no evidence that Defendant's legitimate, non-discriminatory reasons for its pay decisions was a pretext for race discrimination. For the reasons explained below, we must agree with Defendants in both respects.

### 1.     Plaintiff's Prima Facie Case

As mentioned above, to establish her prima facie case (and avoid summary judgment), Plaintiff must show that similarly-situated individuals outside her protected class were treated more favorably. More specifically, in this context, Plaintiff must show that similarly-situated individuals who were not African-American received a higher salary than she. Plaintiff identifies two persons she says were similarly situated to her, that is, Fiscal and Training Coordinator Brenda Adams-Turk and Operations Coordinator Melissa Conrad, at the time the AIM program transitioned from IUPUI to IJJTF operation. It is undisputed that these two individuals were not African American and that they initially received higher salaries than Plaintiff. Thus, the Court must determine only whether these two individuals were similarly situated to Plaintiff.

"To demonstrate that a comparison individual is similarly situated to a plaintiff, the plaintiff is required to produce evidence that the comparison employee is 'directly comparable to her in all material respects.'" Squibb v. Mem'l Med. Ctr., 497 F.3d 775,

---

[6](...continued)
coworker, with whom she was similarly situated, namely, South Bend/North Region Coordinator Theresa Brady.

788 (7th Cir. 2007) (quoting <u>Patterson v. Avery Dennison Corp.</u>, 281 F.3d 676, 680 (7th Cir. 2002)).  This analysis requires the court to examine all the relevant factors, which "most often include whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications – provided the employer considered these latter factors in making the personnel decision." <u>Ajayi v. Aramark Bus. Servs., Inc.</u>, 336 F.3d 520, 532 (7th Cir. 2004).  This analysis inevitably varies from case to case and requires the Court to take a "flexible, common-sense approach" dependent on the context of the case before it.  <u>McGowan v. Deere & Co.</u>, 581 F.3d 575, 579-80 (7th Cir. 2009).  "Regardless of the context, however, the purpose of the test remains the same: to discern whether there are sufficient common factors between the plaintiff and another employee to allow for a meaningful comparison in order to divine whether discrimination was involved in an employment decision." <u>Id.</u>

  **a.**  **Brenda Adams-Turk**

  Defendants contend that Plaintiff cannot establish that she and Adams-Turk were similarly situated based on their significantly different duties.  As described by Plaintiff, Adams-Turk handled "anything financially related to the AIM program, as far as pay, any contract requirements, grant requirements.  The fiscal requirements for any grants, she handled that information.  And then she also assisted in the coordination of the AIM Institute [an AIM training program offered to adults that were going to work with juveniles]." Duffy Dep. 55-56.  Plaintiff further admitted that her position at IJJTF was

"significantly different" from the position held by Ms. Adams-Turk.  Id.  at 57.

Defendants maintain that the respective levels of education and experience between

Plaintiff and Ms. Adams-Turk also render them not comparable.  Def.'s Mem. at 16-17.

Plaintiff does not respond directly to Defendants' arguments regarding the

differences in duties between the positions she held at IJJTF and that of Ms. Adams-Turk.

Rather, she rejoins that Adams-Turk was similarly situated to her at the time of the AIM

transition, based Glick's statement that he intended Plaintiff and Adams-Turk to be on the

same "level," made during the pre-transition meeting discussed above.[7] Id. at 7, 9.

Plaintiff cites her own affidavit as well as the affidavits of Conrad and Heath Hurst (a

former AIM Director who left the program when it transitioned to IJJTF) to verify that

Glick actually made this statement.  See Duffy Aff. ¶ 18; Conrad Aff. ¶ 7; Hurst Aff. ¶ 5.

She references in addition that Glick further indicated that Plaintiff, Adams-Turk and

Conrad were all to report to Dr. Jarjoura.  Duffy Aff. ¶ 18; Conrad Aff. ¶ 7.

Our view of Glick's statements regarding the organizational chart and that all three

employees would report to Dr. Jarjoura less than convincing in terms of establishing that

Plaintiff was similarly situated to Ms. Adams-Turk.  Organizational charts are

demonstrative tools utilized to explain the relationships among employees, including the

_____

[7]Plaintiff also argues that she was similarly situated to Brenda Adams-Turk based on the
fact that they held the same job title prior to the transition of the AIM program.  Pl.'s Resp. at 9.
However, she has cited no evidence in support of this contention.  Even if true, however, the fact
that Adams-Turk and Plaintiff held the same positions prior to the transition matters little, given
Plaintiff's testimony that all of the AIM positions were "new" when the program transitioned to
IJJTF.  Duffy Dep. at. 57.

hierarchy of supervisor/supervisee within an organization.  No surprise, therefore, that

Plaintiff, Adams-Turk, and Conrad appear on the same level of any organization chart,

given their shared supervisor.  The single fact that all three employees reported to Dr.

Jarjoura fails to establish that the employees were "directly comparable . . . in all material

respects," Patterson v. Avery Dennison Corp., 281 F.3d 676, 680 (7th Cir. 2002), and, in

fact, Plaintiff's admission regarding the significant differences between her duties and

those of Ms. Adams-Turk undermines any contrary conclusion.  Ms. Adams-Turk's

education and experience also support a finding that she was not similarly situated to

Plaintiff.  As Defendants note, Ms. Adams-Turk had considerable experience performing

the various finance-related functions that IJJTF found valuable for its Fiscal and Training

Coordinator.  Glick Aff. ¶¶ 12-14, Attachment I.  Plaintiff apparently lacked any

comparable specialized experience.  Indeed, Plaintiff has not attempted in any fashion to

compare her education and/or experience to those of Ms. Adams-Turk at all, instead,

maintaining that her education and experience compared to Ms. Adams-Turk should not

be considered at all because IJJTF never informed her that it would rely on those factors

in determining pay.  Glick testified that he considered the "individual's experience, job

responsibilities, place in the chain-of-command, education, and special skills," when

determining rates of pay for the AIM staff.  Glick Aff. ¶ 24.  Whether or not Plaintiff was

aware of that assessment is immaterial.  See Randall v. Rolls-Royce Corp., 742 F. Supp.

2d 974, 989 (S.D. Ind. 2010 (Barker, J.).  Clearly, Plaintiff has failed to establish that she

and Ms. Adams-Turk were in fact similarly situated employees of IJJTF.

### b. Melissa Conrad

Defendants next argue that Plaintiff cannot establish that Conrad and she were similarly situated due to their significantly different duties. Defs.' Mem. at 17-18. Moreover, as with Ms. Adams-Turk, Defendants note that the respective levels of education and experience of Plaintiff and Conrad render them incomparable.[8] Def.'s Mem. at 18.

Plaintiff rejoins that her duties significantly overlapped with those performed by Ms. Conrad. These overlapping duties, according to Plaintiff, included serving as liaison between IJJTF and the adult and juvenile courts and the Department of Corrections, assisting with information and documentation in connection with various grants, assisting with and coordinating activities in the AIM Training Institute, and writing grants. Duffy Aff. ¶ 14. Ms. Conrad testified that she initially relied on Plaintiff and other AIM coordinators "to help familiarize [her] with the program and various job duties." Conrad Aff. ¶ 8. Plaintiff again provides no response to Defendants' argument regarding the respective levels of education and experience between Plaintiff and Conrad.

Plaintiff again fails in her attempt to establish that she was similarly situated to

----

[8]Defendants claim that Conrad received a higher salary than Plaintiff because Conrad, unlike Plaintiff, was an "outside hire," who negotiated her starting salary. Glick Aff. ¶ 25. Plaintiff denies that Conrad negotiated her salary based on Conrad's testimony that she was told by Helferich to expect a salary based on what Helferich had learned from Plaintiff regarding what the current AIM employees anticipated that salaries would be, once the AIM transition had occurred. Conrad Aff. ¶ 4. We find this factual dispute (involving what is essentially, a reason for the disparate pay) irrelevant for purposes of determining whether Conrad and Plaintiff were similarly situated.

Conrad. To buttress her assertion that she and Conrad performed some of the same duties, Plaintiff has relied entirely upon her own affidavit. Such reliance is permissible provided that the affidavit "meet[s] the usual requirements, such as being based on personal knowledge and setting forth specific facts showing that there is a genuine issue for trial." McGowan, 581 F.3d at 580. Here, Plaintiff's testimony is at best vague as to a few overlapping duties cited by her as having been shared by her with Conrad. This meager mustering of evidence is clearly insufficient to establish a genuine issue of material fact regarding whether the two women were similarly situated. It is undisputed that Conrad and Plaintiff had different job titles and, according to the documentary evidence proffered by Defendants, different primary duties. Compare Second Glick Aff., Attachment 1 (Community Resource Coordinator Job Description) with Glick Aff., Attachment 3 (Program Operations Coordinator Job Description). Without more, the single fact that Conrad and Plaintiff collaborated on certain tasks or duties on occasion won't cut it in terms of providing a basis upon which a reasonable jury could conclude that the two employees were similarly situated. Furthermore, as discussed above in relation to Ms. Adams-Turk, Plaintiff has entirely failed to establish that she and Conrad had comparable credentials. Conrad's "experience, education and qualifications" are highly relevant to the Court's inquiry into whether she and Plaintiff were "directly comparable . . . in all material respects." Squibb, 497 F.3d at 788. Therefore, we hold that Plaintiff's failure to establish that she and Conrad were similarly situated defeats her prima facie case showing of race discrimination.

## 2.    Plaintiff's Claim of Pretext

Even if Plaintiff had established a prima facie race discrimination claim, she has

failed to satisfy her burden to show that the IJJTF's purported reason for paying Plaintiff

less than Conrad or Adams-Turk was pretextual, i.e. "a dishonest explanation, a lie rather

than an oddity or an error."  Kulumani v. Blue Cross Blue Shield Ass'n, 224 F.3d 681,

685 (7th Cir. 2000) (citing Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133,

147-148 (2000)).  The Seventh Circuit has held on numerous occasions that pretext can

be established by a showing that either a discriminatory reason more likely motivated the

employer to pay the plaintiff less or the proffered reason for the employer's payment

decision is not worthy of belief.  See Simmons v. Chi. Bd. of Educ., 289 F. 3d 488, 492

(7th Cir. 2002).

Plaintiff's pretext theory is based on an assertion that the responses she received

from Helferich, Rempel and Glick in response to her inquiries regarding her pay provided

inconsistent justifications for IJJTF's pay decisions.[9]  Pl.'s Resp. at 11-12.  Plaintiff

points out that Helferich told her that she received the salary that she was supposed to

receive at the time AIM transferred to IJJTF.  Helferich Aff., Attachment 1.  But Rempel

---

[9]Plaintiff also asserts that it is "very telling" that she anticipated that her salary would be $35,000 and that Conrad was paid that amount when she accepted her position with the IJJTF.  It is unclear to the Court what Plaintiff intends by this statement but, in any event, we do not find that this fact, assuming it is true, establishes any lie on the part of any Defendant.  Likewise, the fact that Plaintiff was the only African-American AIM coordinator was, at most, unusual and in any event insufficient on its own to establish pretext.  See Kulumani, 224 F.3d at 684 ("A 'pretext for discrimination' means more than an unusual act; it means something worse than a business error; 'pretext' means deceit used to cover one's tracks.").

told Plaintiff that she did not receive an increase in pay at the time AIM transferred to IJJTF because there was no additional funding for Plaintiff's position. Rempel Aff., Attachment 2. And Glick explained to Plaintiff that her initial salary was based upon "a combination of experience, job responsibilities, an employee's place in the chain-of-command, education and special skills." Glick Aff. Attachment 7.

Although, "[s]hifting and inconsistent explanations [for an adverse employment action] can provide a basis for a finding of pretext, . . . the explanations must actually be shifting and inconsistent to permit an inference of mendacity." Shuster v. Lucent Techs, Inc., 327 F.3d 569, 577 (7th Cir. 2003)(citing Rand v. CF Indus., Inc., 42 F.3d 1139, 1146 (7th Cir. 1994)). A review of the record before us discloses that the cited variations in the explanations offered by Helferich, Rempel, and Glick, respectively, are insufficient to create an issue of material fact with regard to Defendants' justification for Plaintiff's initial salary level determination. Indeed, we find no inconsistency between Helferich's response that Plaintiff had received the salary she was "supposed to" and Rempel's additional explanation that no additional funding had been available for an increased salary at the time Plaintiff was hired. Furthermore, as Defendants point out, Glick's additional explanation that compensation levels "whenever possible . . . [are] based on . . . a combination of experience, job responsibilities, an employee's place in the chain-of-command, education, and special skills" came in response to an additional question from Plaintiff regarding a person whom Plaintiff believed to be similarly situated to her. There is nothing inconsistent or conflicting among those reasons provided by

22

Defendants to Plaintiff.  Thus, no genuine issue of material fact exists with regard to pretext.  See e.g., Johnson v. Nordstrom, Inc., 260 F.3d 727, 733-34 (7th Cir. 2001).

Furthermore, we note that, although Plaintiff failed to advance any arguments relating to other theories of pretext, our own review of the record revealed no evidence to support a finding that Defendants' decision to delay Plaintiff's salary increase until January, 2008 was based on reasons other than those provided to her at the time or that Defendants' decision had anything to do with Plaintiff's race.  Indeed, in light of Glick's testimony that Caucasion Coordinator, Theresa Brady, received the same salary objected to by Plaintiff (Glick Aff. ¶ 26), we find the evidence overwhelming in establishing that Plaintiff's salary determination was not based on race.  See Johnson v. Indopco, Inc., 887 F. Supp. 1092, 1099 (N.D. Ill. 1995) (finding that facts that African-American counterpart earned more than African-American plaintiff, and Caucasian counterpart earned less than plaintiff undercut plaintiff's case for unequal pay based on race discrimination).

### B.    Plaintiff's Retaliation Claims

Plaintiff's final claim for relief is predicated on various acts by Defendants that were violative of Title VII's prohibition against discrimination towards employees who oppose unlawful employment practices.  42 U.S.C. § 2000e-3(a).  "An employee bringing a retaliation claim may use either the 'direct' or 'indirect' methods of proof to support her claim."  Gates v. Caterpillar, Inc., 513 F.3d 680, 686 (7th Cir. 2008) (citing Mannie v. Potter, 394 F.3d 977, 983 (7th Cir. 2005)).  To successfully establish retaliation under the direct method of proof, Plaintiff must (1) offer evidence that she engaged in a statutorily

protected activity, (2) that Defendants subjected her to an actionable adverse employment action and (3) that a causal connection exists between the two events.  Id. (citing Treadwell v. Office of Ill. Sec'y of State, 455 F.3d 778, 781 (7th Cir. 2006)).

Plaintiff asserts that Helferich began a pattern of criticizing her job performance, directing her not to communicate with certain individuals, making derogatory comments about her, and requiring her to engage in a time study only after she had raised concerns regarding her annual salary as compared with other AIM coordinators.  Pl.'s Resp. at 13. Plaintiff also maintains that the employees she supervised were subjected to stricter requirements than other employees following her complaints.  Duffy Aff. ¶ 24.  Notably, however, Plaintiff has not argued that her termination was retaliatory.

Defendants maintain that Plaintiff has failed to establish that any of these alleged actions constitute actionable adverse employment actions.  The United States Supreme Court has held that, to assert a cognizable retaliation claim, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Burlington Nothern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)(citations omitted).  Thus, "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience."  Id.

Assuming increased scrutiny of Plaintiff actually occurred, as we must, we have

serious doubts that the incidents cited by Plaintiff or the single "derogatory comment"[10] would have been sufficient to dissuade a reasonable worker from asserting a discrimination charge. Plaintiff has provided scant argument (nevermind, evidence) regarding the effect of any of these actions on her decision to bring a discrimination charge. In Rivera v. College of DuPage, the Court granted summary judgment to an employer after finding that increased comments and warnings about a plaintiff's job performance, obscene gestures and epithets, and ridicule for the amount of food the plaintiff ate "may have been stressful or hurtful to [plaintiff], . . . [but] would not have dissuaded a reasonable employee from making a complaint." 445 F. Supp. 2d 924, 927 (N.D. Ill. 2006). Although we suspect that the actions complained of by Plaintiff are similarly unremarkable, we reserve a conclusive judgment on that issue in light of the claim's other deficiency discussed below.

Even if the additional scrutiny of Plaintiff's job performance (or of employees supervised by her) could properly be considered "adverse employment actions," Plaintiff's failure to establish a causal connection between those actions and her protected activity dooms her retaliation claim. The sole theory advanced by Plaintiff is that the additional scrutiny she received relative to her job performance and Helferich's comment to another AIM employee corresponded in terms of timing with Plaintiff's complaints

---

[10]The only evidence of a "derogatory comment" made about Plaintiff consists of the account of Heather Wildrick, a former AIM employee, who believed that Helferich was alluding to Plaintiff when the two were discussing a "common denominator" who was contributing to low morale in the office. Wildrick Aff.

regarding her salary; Plaintiff maintains that based on the timing alone a reasonable jury could infer a causal connection between the two events. However, the Seventh Circuit has held that "suspicious timing alone . . . does not support a reasonable inference of retaliation; instead, plaintiffs must produce facts which somehow tie the adverse decision to the plaintiffs' protected actions. The mere fact that one event preceded another does nothing to prove that the first event caused the second." Sauzek v. Exxon Coal USA, Inc., 202 F.3d 913, 918 (7th Cir. 2000). Plaintiff's sparse mustering of facts tying the increased scrutiny she received to her complaints regarding her salary cannot support a prima facie case of retaliation.

## Conclusion

As explained above, Plaintiff has failed to establish her prima facie case of race discrimination or retaliation. In addition, as a matter of law, Plaintiff has failed to show that the legitimate reason proffered by Defendants for the difference between the initial salary paid to her as compared to other AIM employees was pretextual. Therefore, Defendants are entitled to summary judgment on both claims. Defendants' Motion [Docket No. 57] is GRANTED. Final judgment shall enter accordingly.

IT IS SO ORDERED.


Date: _____06/09/2011_____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

26

Copies to:

Gregory P. Gadson
LEE COSSELL KUEHN & LOVE LLP
ggadson@nleelaw.com

Cherry  Malichi
LEE COSSELL KUEHN & LOVE LLP
cmalichi@nleelaw.com

Mitzi H. Martin
BAKER & DANIELS
mhmartin@bakerd.com

Joseph C. Pettygrove
BAKER & DANIELS - Indianapolis
joseph.pettygrove@bakerd.com